UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMPSON PACIFIC CONSTRUCTION, INC., <br><br> Plaintiff, <br><br> v. <br><br> AMERICAN INTERNATIONAL GROUP, INC., et al., <br><br> Defendants. | Case No. 15-cv-01091-WHO <br><br> **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** <br> Re: Dkt. No. 59 |

Defendant AIU Insurance Company (AIU) moves for summary judgment on plaintiff Thompson Pacific Construction, Inc.'s (Thompson) claims for breach of contract and breach of the covenant of good faith and fair dealing over AIU's failure to provide insurance coverage to Thompson's settlement of litigation with Southern California Drywall Co (SoCal), one of its subcontractors. Thompson responds that it is disputed whether the claims in Thompson's underlying litigation were for "property damage" (which could fall within coverage of the policy at issue) and whether other provisions of the applicable policies bar coverage. Because Thompson suffered no "ultimate net loss" under the AIU insurance policy and did not incur compensable property damage, AIU did not breach its contract with Thompson nor its implied covenant of good faith and fair dealing by failing to cover the SoCal settlement. I GRANT summary judgment in favor of AIU and against Thompson.

**BACKGROUND**

Plaintiff Thompson Pacific Construction (Thompson) was the general contractor on a series of construction projects for the Los Angeles Unified School District (LAUSD), including

the Southeast Area Learning Center (SELC).[1] LAUSD terminated Thompson, and litigation commenced among LAUSD, Thompson, and numerous subcontractors. This insurance coverage case arises out of litigation between Thompson and one if its subcontractors, SoCal, over SoCal's work on SELC. Thompson and SoCal settled their claims, with Thompson eventually paying SoCal $307,500. Thompson contends that AIU is bound to cover its settlement payment to SoCal and that its failure to do so constitutes a breach of contract and a breach of the covenant of good faith and fair dealing.

## I. INSURANCE POLICIES AT ISSUE

### A. TIG Policy

TIG Insurance Company issued Policy No. 37675101 to LAUSD as part of an "owner-controlled wrap program." TIG Policy (Dkt. No. 42-1, Ex. B to SAC). The TIG Policy had the following limits: $2,000,000 each occurrence; $4,000,000 Annual General Aggregate; and $4,000,000 Products-Completed Operations. TIG Policy at AIU 000156. The Policy also contains a Contractor Rework Endorsement, which provides separate limits of $1,000,000. *Id*. at AIU00207.

The TIG Policy provided coverage for "damages because of . . . 'property damage' . . . caused by an 'occurrence' . . . and [if] the . . . 'property damage' occurs during the policy period." *Id*. at AIU00158. The TIG Policy defines "property damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property." *Id*. at AIU00169. The TIG Policy excludes coverage for "'property damage' to . . . [t]hat particular part of real property on which you or any contractors or subcontractors working on your behalf are performing operations if the 'property damage' arises out of those operations." *Id*. at AIU00170.

### B. AIU Excess Policy

AIU issued an excess policy to LAUSD, Policy No. 346-51-40. AIU Policy (Dkt. No. 42). The AIU policy "followed form" to the TIG Policy.[2] The AIU Policy provides that it will pay the

---

[1] Unless noted otherwise, the following facts are undisputed.
[2] "Follow form" excess policies incorporate the terms of the primary policy, unless such terms are contradicted by the terms of the excess policy. *See, e.g.*, *Coca Cola Bottling Co. v. Columbia Cas. Ins. Co*., 11 Cal. App. 4th 1176, 1183 (1992).

"Ultimate Net Loss" in excess of the underlying policy up to the policy limits. *Id*. at AIU00216. "Ultimate Net Loss" is defined as "the amount payable in settlement of the liability of the Insured after making deductions for all recoveries and for other valid and collectible insurance, excepting however the Underlying Insurance." *Id*. The AIU Policy disclaimed any duty to defend. *Id*. at AIU00217. Finally, the AIU Policy required notice of occurrences providing an insured, "must see to it that we are notified as soon as practicable of any accident or occurrence which may result in any claim or suit under this policy." *Id*.

## II. PRIOR LAWSUITS

### A. LAUSD Coordinated Actions

In October 2006, LAUSD filed an action against Thompson for failure to perform its contract and fraudulent bidding practices (the "LAUSD action"). Thompson counter-claimed against LAUSD for amounts owed based on LAUSD's improper termination of Thompson and inadequate stop notices. Thompson also cross-claimed against SoCal, because SoCal had been identified in LAUSD stop notices as having supplied insufficient workers.

In December 2006, SoCal sued Thompson (SoCal action), that complaint alleged: (i) a breach of contract; (ii) a claim based on improper enforcement of stop notices; (iii) a common count for materials and services provided; (iv) a common count for reasonable value of materials and services provided; (v) a claim based on the contractor's license bond; and (vi) a claim based on the payment bond. SoCal Complaint (Dkt. No. 42-1), Ex. C to SAC. The claims in the SoCal action were based on work SoCal performed at the SELC, on which Thompson was the general contractor. *Id*. ¶9. The LAUSD and SoCal actions were coordinated, along with other subcontractor actions, into *School District Construction Cases*, Orange County Superior Court Case No. JCCP 4517.

In August 2011, Thompson and SoCal entered into a settlement agreement whereby SoCal dismissed its claims against Thompson and Thompson agreed to prosecute SoCal's "pass-through" claims against LAUSD and to pay SoCal 1% of the amount Thompson recovered from LAUSD. AIU RJN, Ex. 5 [Ex. A] (Dkt. No. 62-5, "SoCal Settlement"). The SoCal Settlement explained that because of the actions of LAUSD, both Thompson and SoCal "incurred extra expenses and

3

costs on" the SELC project. *Id*. at 1.[3]

In May 2012, Thompson and LAUSD agreed to a global settlement of all claims that could be asserted by Thompson against LAUSD, either on its own behalf or as pass-through claims from Thompson's subcontractors. LAUSD agreed to pay Thompson $18.5 million in total, with TIG contributing $4.6 million of that amount. AIU RJN, Ex. 7 [Ex. 5] (Dkt. No. 62-8, "LAUSD Settlement"). The LAUSD Settlement did not apportion the $18.5 million between the different claims being asserted by Thompson (*e.g.*, as between Thompson's claims, SoCal's claims, other subcontractor claims). It *required* Thompson to indemnify LAUSD against any subcontractor claims and to resolve the SoCal litigation. *Id*. at 3, 6.

Thompson argues in opposition to AIU's motion for summary judgment that the $18.5 million settlement "accounted" only for contract balances, payment for undisputed change orders, and simple interest on three LAUSD projects (including SELC), and did not "cover" the SoCal claims. Bannon Decl. ¶¶ 20-21. It asserts that in the settlement, it "could not recover" on its claims for "delay and related damages" for the SELC project and SoCal's damage. *Id*. ¶ 21.

AIU contends that TIG funded the $4.6 million of the LAUSD Settlement with a combination of the "Products-Completed Operations" limit and the "Contractors Rework" limit, leaving the general aggregate limit unexhausted. Declaration of Josephine Gee (Dkt. No. 60) ¶¶ 4, 5. Thompson's attorney declares that he "believed" the $4.6 million from TIG represented TIG's full policy limits, in part because he believed TIG was willing to pay its "policy limits" only if TIG was then excused from its duty to defend Thompson in all actions. Bannon Decl. ¶ 19.

---

[3] In June 2011, counsel for SoCal provided Thompson with documentation substantiating its damages as: "unpaid" time and material "tickets" for patch work, water damage work, and elevator door work, as well as "premium cost" for overtime work. AIU RJN, Ex. 6 [Ex. B] (Dkt. 62-6). SoCal estimated the total for the "unpaid work" was $130,002 plus interest. *Id*. SoCal also sought damages from the increased price of steel given the delays on the project. *Id*. SoCal explained that it considered pursuing an "impact/inefficiency" claim against LAUSD for "the water damage" included, but also a further impact/inefficiency caused by piecemeal nature of the project. *Id*. Both sides agree the "water damage" was to sheetrock (that SoCal needed to replace or repair) caused by delays on the project that pushed SoCal's work into the winter, followed by Thompson's failure to make the project watertight. Bannon Decl., Ex. 9, Deposition Transcript of John Alan Morvant at 165; Ex. 10, Deposition Transcript of Peter Sean Thompson at 28 - 30.

### B. SoCal Settlement Action

After its settlement with LAUSD, Thompson negotiated with SoCal, proposing to pay amounts ranging from a low of $40,000 to a high of $96,400, pursuant to the parties' August 2011 settlement agreement. AIU RJN, Ex. 7 at 2. Thompson eventually paid SoCal $96,400. Bannon Decl. ¶ 28. But SoCal did not agree that $96,400 represented the full amount it was entitled to under the SoCal Settlement. As a result, Thompson filed a motion in the coordinated *School District Construction Cases* action in July 2012, to enforce the SoCal Settlement agreement at the amount of $94,600. AIU RJN, Exs. 4 - 8.

In January 2013, the Superior Court denied Thompson's motion, finding the SoCal Settlement agreement inherently ambiguous and unenforceable, and set the matter for trial. AIU RJN, Exs 9-15 & Ex. 16 (denying motion to enter settlement agreement).[4] In March 2013, SoCal filed an Amended Bill of Particulars, claiming $382,601 in damages, based on $130,002 for "Time and Material Tickets" for electrical patching, overtime, water damage time and materials work, and elevator work, $96,730 for steel price increases, and a "hardship" claim of $152,540 for additional labor due to a "leaking roof." AIU RJN, Ex. 18 [Ex. A] (Dkt. No. 62-19). In addition, SoCal identified further "damages" of $21,953 for patching and $404,536 in "delay and inefficiency damages" for extended overhead and supervision costs and disrupted schedules. *Id*.

Around May 2013, SoCal and Thompson reached an agreement, and Thompson asked the *School District Construction Cases* court to reconsider its prior request to enter judgment of dismissal upon Thompson paying SoCal an additional $211,100, for a total of $307,500. AIU RJN, Exs. 19-20. Judgment on the SoCal Settlement agreement was entered by that court in October 2013. AIU RJN, Exs. 21-22.[5]

---

[4] During this time, Thompson and SoCal continued to file motions, with Thompson seeking to reinstate dismissed counter-claims and SoCal serving amended bills of particular identifying increased damages. *See, e.g.*, AIU RJN, Exs. 17-18.

[5] TIG defended Thompson in the LAUSD action and funded the settlement of LAUSD's claims against Thompson, but only after losing rulings in a separate coverage action that was part of the coordinated *School District Construction Cases* proceedings, where the court concluded that TIG owed Thompson a duty to defend under the "Rework" endorsement in the TIG Policy. AIU RJN, Ex. 3. In that case, TIG sued Thompson seeking declaratory relief that no defense was required, and Thompson cross-complained against TIG and AIU seeking a defense. AIU RJN, Ex. 2. Thompson dismissed all claims and causes of action against AIU in that case with prejudice on

5

**LEGAL STANDARD**

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.* The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby,* 477 U.S. 242, 257 (1986).

On summary judgment, the Court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255. In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir.1979).

**DISCUSSION**

**I. BREACH OF CONTRACT**

**A. Ultimate Net Loss**

AIU argues that Thompson cannot be considered to have suffered any "ultimate net loss" covered by the AIU Policy because the "damages" Thompson seeks here were covered by the LAUSD Settlement. As noted above, the LAUSD Settlement specifically mentioned and required Thompson to promptly resolve the SoCal litigation. LAUSD Settlement (Dkt. No 62-8) at 3 ("TPC and Peter Thompson will resolve the other subcontractor and supplier claims now pending in the Coordinated Action, including . . . Southern California Drywall. . . ."). AIU contends that

---

August 3, 2012. Dkt. 46-2.

because Thompson was already paid for the settlement of SoCal's pass-through claims through the LAUSD Settlement, there can be no "net loss" to which the AIU policy could apply. As noted above, the AIU policy defined "Ultimate Net Loss" as "the amount payable in settlement of the liability of the Insured after making deductions for all recoveries and for other valid and collectible insurance, excepting however the Underlying Insurance." AIU Policy, AIU 000216.

Thompson responds that there is "no evidence" that LAUSD paid SoCal's pass through claims in its settlement with Thompson, asserting that the settlement covered *only* unpaid contract balances, approved work orders, and interest. Bannon Decl. ¶¶ 20-21; Thompson Oppo. 11. However, Thompson admits that the "global claim" settled with LAUSD included SoCal's "pass through" claims. Bannon Decl. ¶ 16 (the 2011 compromise with SoCal contemplated that "TPC would pay SoCal a percentage of the 'global claim' which was the combination of SoCal's pass through claims and all of TPC's claims against LAUSD."). The SoCal Settlement agreement (although not enforced by the Superior Court until October 2013) resolved the litigation between Thompson and SoCal. That agreement explained that SoCal had entered a subcontract with Thompson and that SoCal had a claim against LAUSD "for extra costs and expenses" incurred on the SELC. It noted that as part of their settlement, SoCal's LAUSD claim would be prosecuted by Thompson, and SoCal would be entitled to a percentage of the "global claim" settled by Thompson, the "global claim" being defined as the combination of Thompson, SoCal and additional claims of subcontractors. SoCal Settlement at 1. Similarly, the LAUSD Settlement agreement required, as a condition of settlement with Thompson, that Thompson "resolve" SoCal's claims and secure dismissal of those claims within 30 days of the LAUSD payment, and indemnify LAUSD against any subcontractor claim. LAUSD Settlement, pgs. 1, 5, 6.[6]

The contents of these Settlement Agreements demonstrate, as a matter of law, that the LAUSD Settlement resolved SoCal's claims and the amount of payment owed to it by Thompson. Thompson cannot now attempt to collect under the AIU excess insurance Policy for claims that

---

[6] In its efforts to have the SoCal Settlement enforced, Thompson characterized the intent of the SoCal settlement as "to have TPC pay SoCal 1% of the net amount of the money TPC received to settle the SELC Global claim and to put an end to the litigation." AIU RJN, Ex. 11 at 15.

were covered by the recovery from LAUSD because Thompson did not suffer an ultimate net loss by virtue of the SoCal claim. *See* AIU Policy at AIU00216. That Thompson did not get everything it contends that it or its subcontractors were owed from LAUSD does not alter that conclusion. Had Thompson wanted, it could have negotiated a different settlement with LAUSD that allocated the settlement against specific claims. But it did not. Instead, Thompson received an undifferentiated amount to settle *all* of the LAUSD claims, including subcontractor pass through claims. Thompson could also have negotiated a different settlement agreement with SoCal, also providing a specific dollar amount rather than a percentage allocation. It did not. In light of the undisputed facts and contemporaneous assertions Thompson made in its litigations and settlements with LAUSD and SoCal, Thompson has no basis to argue here that nothing in the LAUSD settlement should be considered settlement of SoCal's pass through claims.

Reviewing the undisputed terms of the SoCal and LAUSD settlement agreements, as well as Thompson's representations regarding the same in its attempt to enforce the SoCal agreement in the *School District Construction Cases* proceedings, I conclude that Thompson fails to raise an issue of material fact showing that it suffered any "ultimate net loss" to SoCal after receiving the $18.5 million settlement proceeds from LAUSD. That Thompson initially challenged the amount to which SoCal was entitled out of the LAUSD settlement proceeds and later agreed to pay SoCal the maximum amount SoCal to which could have been entitled under their agreement does not change the analysis.

AIU is entitled to summary judgment on Thompson's breach of contract claim.

**B. Property Damage**

AIU also argues that the SoCal claims at issue – for which Thompson seeks coverage under the AIU excess policy – are not "property damage" that are covered. Although I need not reach this argument, it is an alternative reason to grant summary judgment to AIU.

Neither side disputes that significant water damage occurred to the SoCal sheetrock at SELC, that SoCal paid to replace and fix the damaged sheetrock, and that SoCal sought payment for that work and those materials from Thompson and LAUSD. The dispute is whether that "damage" is covered "property damage" under the TIG Policy (such that coverage is implicated

8

1  under the AIU excess policy), or instead simply contract damages for unpaid time and materials

2  provided by SoCal under their agreement with Thompson.[7]

3       Setting that dispute aside, AIU also relies on two "works in progress" exclusions from the

4  Policy that it contends defeat coverage. The Policy expressly excludes coverage for:

> j.    Damage to Property
>
>   "Property damage" to
>
> (5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are preforming operations, if the "property damage" arises out of those operations, or
>
> (6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Thompson argues these exclusions – which must be read narrowly – do not bar its claims because: (i) the property damages was not "real property" because the sheetrock was "personal property" of SoCal (excluding j.(5)); and (ii) no work was being performed on the "damaged property" SoCal's sheetrock, when it was damaged by accident or negligence of Thompson (excluding j.(6)).

     Sheetrock already installed and affixed is real property, subject to the exclusions. According to Thompson's own evidence and admission at the hearing on the motion for summary judgment, the value of the uninstalled sheetrock that was damaged was only $15,000 - $20,000. The remainder of SoCal's "property damage" was from damaged sheetrock had been installed by SoCal at SELC and needed to be replaced or patched. *See, e.g.,* Bannon Decl., Ex. 9 (Morvant Depo. Trans. at 144-150); Ex. 10 (Thompson Depo. Trans at 33-34).

     Thompson asserts under j.(6) that the installed sheetrock was not being "worked on" at the time of the damage, and therefore that any damage could not have been on "that particular part of real property" for which SoCal was responsible. But there is no dispute that the contractor – Thompson – was still working on the building as a whole when the sheetrock was damaged. The evidence submitted by Thompson demonstrates that when the water damage occurred, SoCal was

---

[7] There is no dispute that the damage occurred in the "coverage territory" and within the "policy period" covered by the TIG Policy.

1  also still *in the process* of working on the sheetrock at SELC. *See* Morvant Depo. Trans. at 142;
2  Thompson Depo. Trans at 33 ("we were single-siding sheetrock"). As such, there is no dispute
3  that the installed sheetrock is real property falling within the j.(5) and j.(6) exclusions.[8]
4         As to coverage for the uninstalled sheetrock, Thompson relies on *Roger H. Proulx & Co. v.*
5  *Crest-Liners, Inc.*, 98 Cal. App. 4th 182, 203 (2002). In that case, the court applied a differently
6  worded exclusion and determined that while a contractor could not recover the costs to repair a
7  tank liner defectively installed by its own subcontractor under the CGL policy, it might be able to
8  recover for costs spent on repairing other property damaged by its subcontractor's defective work
9  on the tank liner. Here, however, it was the contractor's (Thompson's) own negligence that
10 caused the damage to the sheetrock being installed by the subcontractor. Thompson does not
11 explain why the "your work" in this situation does not include the impact the leaking building
12 (Thompson's work) caused to SoCal's sheetrock (also Thompson's work, but through its
13 subcontractor SoCal). *See, e.g., George F. Hillenbrand, Inc. v. Ins. Co. of N. Am.*, 104 Cal. App.
14 4th 784, 805 (2002) ("In the case of a general contractor, all the work at the project is considered
15 its work product, whereas in the case of a subcontractor, like Hillenbrand, only its portion of the
16 work, such as siding, is the work product and damage to other parts of the project is considered
17 damage to other property.").
18        In sum, Thompson fails to raise a material issue of fact as to how the "property damage" it

---

[8] This conclusion is supported by *Baroco West, Inc. v. Scottsdale Ins. Co.*, 110 Cal. App. 4th 96 (Cal. App. 4th Dist. 2003), where the court construed identical language to j.(5) and j.(6) and concluded that "the policy excludes damage to the property caused during ongoing construction operations performed by the contractor or subcontractor." *Id*. at 104. Thompson argues that the analysis of that case cannot apply here because the "faulty work" there was the property damage by the contractor, where here the "faulty work" was not SoCal's sheetrock, but Thompson's negligence. Oppo. at 17. Thompson, however, does not explain why the result here should be different simply because the contractor's negligent work (which would be excluded) caused the subcontractor's work to suffer. *But see Western Employers Ins. Co. v. Arciero & Sons, Inc.*, 146 Cal. App. 3d 1027, 1031 (Cal. App. 2d Dist. 1983) ("the effect of the policy is to make the contractor stand its own replacement and repair losses while the insurer takes the risk of injury to the property of others."); *see also Clarendon America Ins. Co. v. General Security Indemnity Co. of Arizona*, 193 Cal. App. 4th 1311, 1325 (Cal. App. 2d Dist. 2011) ("the risk of replacing and repairing defective materials or poor workmanship has generally been considered a commercial risk which is not passed on to the liability insurer."). These cases support the proposition that Thompson, not AIU, bears the risk of the damages at issue.

1  seeks coverage does not fall within the Policy's exclusions.[9]

2  **II. BREACH OF IMPLIED COVENANT**

Thompson also claims that AIU breached the covenant of good faith and fair dealing by failing to step up and pay benefits after its May 2013 tender, forcing Thompson to incur expenses in this litigation, including attorneys' fees. "[T]o establish breach of the implied covenant: (1) benefits due under the policy must have been withheld; and (2) the reason for withholding benefits must have been unreasonable or without proper cause." *Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136, 1151 (1990); *see also Century Sur. Co. v. Polisso*, 139 Cal. App. 4th 922, 949 (2006) ("a breach of the implied covenant of good faith and fair dealing involves something more than a breach of the contract or mistaken judgment. . . . There must be proof the insurer failed or refused to discharge its contractual duties not because of an honest mistake, bad judgment, or negligence, 'but rather by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement.'" (internal citation omitted).

Thompson complains about the following conduct in an attempt to show that AIU acted unreasonably with respect to this coverage case: (1) AIU should have known about Thompson and SoCal's ongoing litigation dispute following the LAUSD settlement, and therefore could reasonably have had notice that its excess policy was at risk; (2) AIU has acted unreasonably in this litigation by playing a "shell game," moving for judgment on the pleadings as to former-defendant and related-corporate entity AIG and failing to provide Thompson with copies of the relevant insurance policies until after AIG filed that motion.

Having concluded that no coverage is due under the AIU Policy – that, as noted above, did not contain a duty to defend – there can be no claim for breach of the covenant. *Waller v. Truck*

---

[9] I need not reach the parties' additional arguments but note that Thompson has failed on this record to demonstrate what portion of the $307,500 settlement payment to SoCal was made for "property damage" in response to AIU's argument that none was. Thompson's argument that because AIU did not defend or participate in the SoCal settlement and subsequent enforcement litigation (despite its knowledge of the same), AIU is "bound by the settlement" is without merit. Oppo. at 19. The cases relied on by Thompson either assume coverage was wrongly denied or are inapposite cases which arise in the "directors and officers" liability context. Oppo. at 19-20.

*Ins. Exch., Inc.*, 11 Cal. 4th 1, 36 (1995). Even if there were a possibility of coverage, I do not find that AIU's refusal to provide coverage for the SoCal settlement was unreasonable, especially considering Thompson's express admission that it never tendered the SoCal litigation directly to *AIU* until after this case was filed. *See, e.g., California Shoppers, Inc. v. Royal Globe Ins. Co.*, 175 Cal. App. 3d 1, 57 (Cal. Ct. App. 1985) ("More particularly, without actual presentation of a claim by the insured in compliance with claims procedures contained in the policy, there is no duty imposed on the insurer to investigate the claim.").[10]

With respect to AIU's litigation conduct in this case – assuming conduct of an insured once litigation has begun can form the basis of a bad faith claim – I do not find that AIU's litigation tactics in this case were unreasonable or without proper cause.[11]

AIU's motion for summary judgment on Thompson's claim for breach of the implied covenant is GRANTED.

### III.     EVIDENTIARY OBJECTIONS

For purposes of ruling on the motion for summary judgment, I rule as follows on the parties' evidentiary objections.

#### A. Thompson's Evidentiary Objections

Thompson's objections to paragraphs 2-7 of the Declaration of Josephine Gee (Dkt. No. 60) based on personal knowledge are OVERRULED. Thompson's objections to paragraphs 4-7 of the Gee Declaration based on hearsay, lack of personal knowledge, and inadmissible opinion are OVERRULED. There is a sufficient foundation for her testimony as to the content of AIG's business records, kept on behalf of AIU. Thompson's objections to paragraphs 6-7 of the Gee Declaration as irrelevant are OVERRULED.

---

[10] Thompson says discovery – which has not been produced – from claims administrator AIG Claims may show that AIU had actual knowledge of the ongoing SoCal/Thompson litigation or show that AIU had notice when Thompson's tendered the SoCal litigation under its own policy to another AIG subsidiary, AIG Specialty, in May 2013. But Thompson's tender to AIG Specialty or even actual notice of the ongoing SoCal/Thompson litigation by AIU does not mean that AIU could have *reasonably expected* a coverage claim from Thompson, especially given how the LAUSD settlement was structured.

[11] Having found no bad faith, there are no grounds for an award of attorneys' fees or punitive damages and summary judgment on those claims is GRANTED to AIU as well.

1    Thompson's objections to paragraph 6 of the Declaration of Vito Biundo (Dkt. No. 61)
2    based on hearsay, best evidence rule, and relevancy are OVERRULED.
3    Thompson's objections to AIU's "speaking" Requests for Judicial Notice (Dkt. Nos. 62,
4    78) are noted, but OVERRULED.  In any future filings, AIU should refrain from excessive
5    citations to the contents of the documents it requests the Court take judicial notice of.
6    Thompson's objections to paragraphs 14 – 16 of the Declaration of Joshua A. Zlotlow
7    (Dkt. No. 79) under the Best Evidence Rule are DENIED.

### B.  AIU's Evidentiary Objections

AIU objects to the Declaration of Alexander Bannon (Dkt. No. 76) in full, because Bannon was not identified in Thompson's Rule 26 disclosures.  AIU Reply at 2-3.  AIU also argues that because Thompson's Rule 30(b)(6) declarant – Peter Thompson, the sole remaining employee – was unable to provide any substantive testimony on many deposition issues regarding this coverage action, Thompson is impermissibly trying to avoid summary judgment by relying on its undisclosed attorney testimony.  *Id*. at 3.  Given the parameters of this coverage case, there is no prejudice to AIU from any failure to disclose Bannon as a witness.  AIU knew Bannon was involved in negotiating the SoCal and LAUSD settlements and in negotiations with AIU for coverage.  His documents and correspondence have been either disclosed or provided for review to AIU.  There is no prejudice to AIU and the objection is OVERRULED.

AIU's objection to paragraph 12 of the Bannon Declaration based on relevance is OVERRULED.  AIU's objections to portions of paragraphs 11, 13 & 19 in Bannon's Declaration as hearsay and improper belief testimony are OVERRULED.  AIU's objections to paragraphs 19, 21, and 22 of the Bannon Declaration based on violation of the mediation privilege and best evidence rule are OVERRULED.  AIU's objections to paragraphs 28, 29, 31, and 33 on the grounds of relevance and falsity are OVERRULED.

AIU also object to various exhibits attached to the Bannon Declaration, including Exhibits 1 and 9 on the grounds those documents were never produced to AIU.  Based on the information supplied in the Declaration of Alex Bannon (Dkt. No. 80), those objections are OVERRULED.  AIU's objection to Exhibit 5 based on relevance is OVERRULED.  AIU's objections to Exhibit 8

on the grounds of authentication and hearsay are OVERRULED.

## CONCLUSION

Summary judgment is GRANTED in favor of AIU and against Thompson.

**IT IS SO ORDERED**.

Dated: May 2, 2016



WILLIAM H. ORRICK
United States District Judge

14